**AMERCO MARKETING COMPANY OF MEMPHIS, INC., Defendant-Appellant,**

v.

**Carlos MYERS, Administrator, Estate of Junior J. Myers, Deceased, et al., Plaintiff-Appellee,**

and

**James A. Seymour and Elphreda B. Seymour, Defendants-Appellees.**

**No. 73-1524.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 30, 1974.

Decided April 16, 1974.

Charles E. English, Bowling Green, Ky., for defendant-appellant; English, Lucas, Priest & Owsley, Bowling Green, Ky., on brief.

Paul R. Huddleston, Bowling Green, Ky., for plaintiff-appellee; Marion Vance, Glasgow, Ky., on brief.

H. Francis Stewart, Stewart & Estes, Nashville, Tenn., on brief for defendants-appellees.

Before McCREE and LIVELY, Circuit Judges, and McALLISTER, Senior Circuit Judge.

LIVELY, Circuit Judge.

This diversity action arose out of a collision which took place on Interstate Highway 65 (I-65) a short distance north of Bowling Green, Kentucky. The plaintiff is the personal representative of three occupants of a south-bound Ford Pinto who received fatal injuries in the collision. The other vehicle was a 1966 Plymouth owned by the defendant James A. Seymour and his wife Elphreda B. Seymour who was driving the automobile north on I-65 at the time of the collision. The Seymour automobile was pulling a U-Haul trailer which Mr. Seymour had rented from an agent of the defendant Amerco Marketing Company of Memphis, Inc. (Amerco) in Memphis, Tennessee the previous evening. Amerco also furnished a trailer hitch which was attached to the rear bumper of the Seymour automobile. The complaint alleged that Amerco

was "negligent in hooking said trailer and hitch to said automobile, so that, the attachment was defective and unsafe. Consequently . . . the connection fell apart causing the automobile to go out of control and into a violent collision with another vehicle operated by Junior J. Myers." The complaint also alleged that Mr. and Mrs. Seymour were careless in the operation of their automobile and trailer and that this was a contributing cause of the collision.

All of the occupants of the Myers car were killed, and Mrs. Seymour was the only occupant of her car who was awake at the time of the collision. She testified that she was running normally in the outside, or slow, lane of I–65 prior to the events immediately preceding the collision and that the trailer was pulling easily. She and her husband both testified to previous stops between Memphis and Bowling Green at which times the trailer connection seemed to be all right. Mrs. Seymour's description of the collision was as follows:

And I noticed this Chrysler Corporation place after we passed it—it's sort of a landmark, because when we first started coming it was just being built. I noticed that, and I was just driving along and everything was seemingly just lovely. The radio was playing and I was driving along, and all of a sudden that car just out of the clear blue, just out of nowhere, the car just took a lunge like it was taking off like an airplane, just taking off to the right, and I just didn't know what was happening and I—my only instinct was to grip that wheel, grip that wheel (Indicating), and by that time it was just going on to the left, and we were over in the median, and I just held the wheel trying my best to guide it, because I saw it was out of—I was just trying to guide it, and I tried to keep it in that median and I tried hard to keep it in that median. And when I—I thought it had come to a stop, and about the time I thought it had come to a stop, you

know, slowed down, well, I didn't know anything, it had gone over in the next lane, and just at that point was this brown car and I realized we were collided, had collided, and we landed into the bank, and when we landed into the bank, well I—I looked down and I saw flame.

Almost immediately Mrs. Seymour corrected this testimony to state that the automobile lunged to the left, not to the right, and went straight into the grass median. Mrs. Seymour first said she did not remember hearing any sound immediately prior to losing control of the car, though on cross-examination it was brought out that she had previously testified that she did hear a noise, described as a "pop," just as the car started veering. She said that she glanced in her rear view mirror and the trailer was "sort of swaying." She heard a bumping noise behind her but did not remember hearing any dragging or scraping noise. Mrs. Seymour estimated her speed at between 50 and 55 miles per hour, though there was other evidence that she had told an investigating Kentucky State trooper that she was driving about 65 miles per hour. She stated that she had not noticed a sign on the rear of the trailer indicating a maximum safe speed of 45 miles per hour.

While no witness testified that he actually observed the collision between the vehicles, two truck drivers who were in the vicinity testified concerning what they saw and heard. James D. Earp who was operating a tractor-trailer south bound on I–65 made this statement:

Well, anywhere between six to six-thirty in the morning, it just started getting daylight, I noticed this car on the left side of the interstate going north. It got just about parallel with me and it sounded like, something like a shotgun blast, like a tire blew out, and the car started weaving and I started stopping and pulled over to the edge of the interstate and I got stopped just about at the entrance to the rest area and by the time I got

out of the truck and started back the Plymouth that was pulling a U–Haul trailer was headed into the bank on the south-bound side.

Earp further stated that after the collision the Ford and Plymouth were sitting up against a bank on the west side of the south-bound lanes of the highway and that the trailer and trailer hitch were all intact, but separated from the Seymour automobile and sitting in the passing lane of south-bound I–65.

Another truck driver named Aiken was also proceeding south on I–65 and saw a set of lights flash or dip in the north-bound lane. He didn't see the Seymour car cross the median or collide with the Myers car. However, he was confronted with the trailer and hitch in the passing, or east lane of south-bound I–65, and maneuvered his truck between the U–Haul trailer and the two automobiles which had collided and were sitting side by side on the west side of the highway. This witness examined the trailer and hitch and found them intact with the chains still wrapped around the hitch. He also noticed a gouge in the passing lane of the north-bound portion of the highway near the median. The witness testified that the right front tire of the Plymouth was down and looked as if it had been penetrated by the bumper or bumper arm. He did not notice the left front tire as it was against the earth bank on the west side of the highway.

The first officer to arrive at the scene of the collision was Sheriff Montgomery who described marks which he found in the north-bound portion of the highway and the grass median. He testified that there were no marks made by the rim of a wheel. State Trooper Pitcock located the point of impact as near the center of the two south-bound lanes of the highway and testified concerning marks which he found in the road. He stated that in his opinion none of the marks was made by the rim of a deflated tire or wheel and that his examination indicated that the marks in the highway and median were made by the trailer hitch.

He told of a trench two and one-half inches deep and six to eight feet long in the grass median leading to the point where the trailer overturned. Trooper Lusher who went to the scene of the accident later in the day for the purpose of making pictures observed a gouge mark in the roadway in the right lane of the north-bound portion of the highway and testified that there were no tire marks south of this gouge.

The garage mechanic who removed the trailer from the scene of the accident to Bowling Green testified that he found the trailer in the grassy median between the north and south-bound lanes of the highway. He said that the trailer hitch was still connected to the trailer with the chains attached. He stated that he was sure that "the safety chains were wrapped from the trailer tongue to the trailer hitch." The owner of the agency from whom the U–Haul trailer was leased testified that safety chains are required on all towed vehicles and that their purpose is to maintain control of the trailer and prevent trailer hitches from dropping to the pavement "in case a bumper tears off or something." He said that the safety chains are hooked to the frame of the automobile rather than to the bumper on which the trailer hitch is mounted. An experienced employee of the same agency, Roosevelt Hale, testified that the chains should be crossed under the tongue to keep it from hitting the ground if it comes loose and that the hooks at the end of the chains must be fastened to the frame of the car, rather than to the bumper or the trailer hitch. Another employee of the agency testified that if the hitch bar should come off of the bumper the trailer would still be attached to the car by chains properly secured to the frame of the automobile.

Neither employee of the Amerco agency who testified could remember dealing with the Seymours. Mrs. Seymour's son testified that he observed a young man, not Roosevelt Hale, install the trailer hitch on the rear bumper of the Seymour car. He said that he noticed that two chains which were attached to the

trailer were dragging and that the employee making the installation attached them to the bumper of the car. He said that they were not attached any place else and that he was certain that the chains were not attached to the frame of the car. He further testified that no written or oral instructions concerning installation or operation of the U-Haul trailer were given either to him or to Mr. Seymour. This was confirmed by James Seymour, who signed the lease agreement for the trailer. Mr. Seymour, also testified that his automobile was in good mechanical condition, told of recent maintenance which it had received and stated that it was equipped with heavy-duty shock absorbers.

The hitch which accompanied the trailer consists of a bar several feet wide on which a metal ball having a diameter of two and one tenth inches is mounted. Sliding clamps are mounted on each side of the ball and these are secured to the rear bumper of an automobile in such a manner as to place the ball in the center of the vehicle. The clamps are secured to the bumper by means of large wing nuts which are tightened by hand. A flat washer and a lock washer are inserted under the wing nut and when it is tightened to the point that the lock washer is compressed to a flat condition the wing nut is locked in place. The manager of Amerco's national office was called by the plaintiff as if on cross-examination and he agreed that the design of the trailer hitch and clamps permits the use of a spring lock washer and a "jamb nut" above the wing nut. This witness testified that it is not necessary to use these devices above the wing nut since the use of a flat washer and lock washer below the wing nut makes the installation safe.

The designer of the hitch was called as a witness for the defendant and testified that the jamb nut is never used on a multi-clamp bumper hitch because it is rendered safe by use of a lock washer beneath the wing nut. He further testi-

fied that the applicable standards of safety do not require a jamb nut and stated on cross-examination that the standards do not specify the use of wing nuts at all. A qualified metallurgist testified for the defendant that he had examined the trailer and the hitch and the vehicles involved in the accident. He stated that he was able to determine that the bumper and trailer hitch were attached to each other at the time the Seymour automobile swerved, pulling the trailer hitch "severely from the bumper." He described the sequence of events as he had reconstructed them and stated that the first thing that happened in connection with the collision was the loss of control of the Seymour automobile. This witness also testified that in his opinion the lock washers were sufficient to prevent the wing nuts from backing off and while a jamb nut would be an additional safety device ". . . in this case it would have been a redundant system because the lock washers themselves acted to prevent the wing nuts from backing off." The other expert witness called by the defendant Amerco, a mechanical engineer who specializes in traffic accident reconstruction, answered a hypothetical question that the cause of the loss of control of the Seymour automobile was that its left front tire blew out. He explained the gouge marks in the highway and ruled out any mechanical failure other than a blowout. He testified that the wing nut and clamps were in position prior to the accident but that when the car swerved sharply to the left the trailer rotated to the right and the hitch bar was torn off of the bumper. He stated that the gouges in the highway and the median were not caused by the hitch bar or the skid plate.

Amerco made a motion for a directed verdict at the conclusion of the plaintiff's case and this motion was renewed when all parties had rested. The jury returned a verdict in favor of James

Seymour and Elphreda Seymour and against Amerco as follows:

For Junior J. Myers
Estate............. $124,832.92

For Linda Ann Myers
Estate ............ $125,759.15

For Anna Lois Myers
Estate ............ $ 51,387.00.

Motions for a new trial and for judgment not withstanding the verdict were overruled.

■ On appeal there is no objection to the instructions under which the case was submitted to the jury. Throughout the trial the defendant Amerco objected to the use and subsequent introduction of various exhibits which had not been listed in advance of trial by the plaintiff in accordance with a pretrial order. In cross-examining defense witnesses, counsel for the plaintiff exhibited jamb nuts, lock nuts, bolts, springs and other mechanical devices and requested the witnesses to demonstrate the use of these devices on the multi-clamp bumper hitch. The exhibits were introduced for the purpose of showing that the design of the hitch would permit the use of additional devices to secure the wing nuts, and did not constitute an attack on the design of the hitch. It was within the discretion of the court to waive the requirement of the pretrial order and to permit the introduction of these exhibits since they were used to demonstrate the single theory upon which the plaintiff proceeded throughout the trial. Amerco relies on Warner v. Kewanee Machinery and Conveyor Company, 411 F.2d 1060 (6th Cir. 1969), cert. denied, 398 U.S. 906, 90 S.Ct. 1685, 26 L.Ed.2d 65 (1970), where a judgment was vacated because the trial court improperly admitted certain exhibits. As in the present case, the exibits were introduced during cross-examination of witnesses for the defendant. All of the exhibits in question were printed publications and it was held that error was committed with respect to two of them by the failure of the court to instruct the jury that they were received solely for the purpose of impeaching testimony of a witness for the defendant. The error which the court found in the admission of the third exhibit was stated by the court in the following language:

> Had the exhibit been identified by and offered during the testimony of a witness called by plaintiff, defendant would have been afforded an opportunity to cross-examine concerning the authenticity and particularly the date of publication of the booklet. Not only was defendant denied this opportunity, but obviously the witness undergoing cross-examination by plaintiff lacked the ability to provide information in these areas. In other words, not only was proper evidence on these crucial points not offered, it was not even available from the witness through whom the exhibit was offered. 411 F.2d at 1064.

No such problem existed in the present case because the witnesses to whom the exhibits were shown readily identified them and agreed that they might be put to the use suggested by the plaintiffs, but insisted that they were not needed to obtain a secure connection of the trailer hitch to the automobile bumper. Furthermore, the first reference to "a lock nut - lock-wash" came in the deposition of Roosevelt Hale, a witness for the plaintiff who was cross-examined by counsel for Amerco. This witness was admittedly experienced in installation of multi-clamp, bar-type trailer hitches. It was the position of the defendant that Roosevelt Hale had made the installation on the Seymour automobile, while witnesses for the plaintiffs maintained that a younger man had done it. Referring to the wing nuts which secured the clamps of the hitch to the bumper, the witness Hale said, "It's nothing to tightening it. You put it on there and that lock nut on there holds it." The hitch which the defendant produced at the trial had flat washers and lock washers between the wing nuts and the top of the clamps, but nothing on the bolt above the wing nuts. It was for the purpose

of illustrating the simplicity of also using a lock or jamb nut above the wing nut that the demonstration involving these exhibits was conducted. We find no error in the admission of these exhibits or the use of toy-size models of an automobile, trailer, and hitch.

A more serious issue was presented to the district court by the defendant's motion for judgment notwithstanding the verdict, where it was claimed that no submissible jury case was presented on the question of whether the hitch and trailer were negligently installed on the Seymour automobile. The defendant argued that the plaintiff's evidence at best supported the possibility that the trailer hitch came apart and that the plaintiff failed to carry his burden of producing evidence to establish the probable cause of the accident. On appeal, Amerco relies principally on Midwestern V. W. Corporation et al. v. Ringley et al., 503 S.W.2d 745 (Ky.1973). In that case the Kentucky Court of Appeals held that the plaintiff failed to establish a jury issue as to causation. The Kentucky rule on the plaintiff's burden of introducing evidence of causation was stated as follows:

> Although the jury may draw reasonable inferences from the evidence of a defect in manufacturing, it is incumbent on the plaintiff to introduce evidence that will support a reasonable inference that the defect was the "probable" cause of the accident as distinguished from a "possible" cause among other possibilities; otherwise, the jury verdict is based on speculation or surmise.

This rule has been applied to negligence cases as well as those based on strict liability. See Huffman v. SS. Mary and Elizabeth Hospital, 475 S.W.2d 631 (Ky.1972); Briner v. General Motors Corporation, 461 S.W.2d 99 (Ky.1971); Holbrook v. Rose, 458 S.W.2d 155 (Ky. 1970). Amerco maintains that the only evidence in the record of negligence or causation consists of a pyramiding of inferences as to possible, rather than probable, causes. It is claimed that the plaintiff failed to introduce sufficient proof "to tilt the balance from possibility to probability."

When presented with a motion for a directed verdict, the trial court must view all the evidence most favorably to the party against whom the motion is made. Rock v. Creacy, 430 S.W. 2d 137 (Ky.1968); Price v. Firestone Tire & Rubber Company, 321 F. 2d 725 (6th Cir. 1963). On appeal, we are bound to view the evidence in the same way and to give the non-moving party "the benefit of all inferences which the evidence fairly supports, even though contrary inferences might be drawn." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). Viewed in this light, the evidence reveals that the safety chains attached to the trailer hitch were hooked to the bumper of the Seymour car rather than to its frame. Furthermore, no lock nut or jamb nut was placed on the bolt which secured the clamps to the bumper above the wing nuts. Although the testimony of Roosevelt Hale concerning the use of lock nuts was confusing, the jury could conclude from it that the use of such a nut above the wing nut was required. There was direct evidence that the purpose of requiring the safety chains to be attached to the frame of the car was to control the trailer in the event that the bumper hitch should somehow become disengaged from the bumper. Roosevelt Hale testified that the purpose of crossing the safety chains under the tongue of the trailer assembly was to prevent the tongue or its skid plate from falling to the surface and dragging in such an event. The opinion of at least one of the investigating officers was that the gouges and marks in the passing lane of the northbound section of I–65 and in the grass median were caused by the trailer hitch or the skid plate. In addition, Mrs. Seymour testified that immediately after the automobile began veering to the left she looked in the rear view mirror and saw that the trailer was swaying from

side to side. The evidence is clear, also, that at some point the trailer and the hitch, including the safety chains, became disengaged from the bumper of the Seymour automobile and ended up in the easterly or passing lane of south-bound I–65 whereas the car itself came to rest against an earth bank off the west side of the south-bound lanes of the highway.

If the jury believed the evidence just recited, it could reasonably have found that the safety chains on the multi-clamp trailer hitch were not crossed beneath the tongue of the trailer or attached to the frame of the Seymour car and that an attendant much younger than Roosevelt Hale had made the installation and failed to secure the wing nuts with lock nuts. It could also reasonably have found that the trailer was swaying from side to side immediately after Mrs. Seymour heard a noise behind her and felt her car veer to the left. The jury could also have found from the direct evidence of qualified witnesses that a gouge in one of the north-bound lanes of I–65 and the grass median separating it from the south-bound lanes was caused by the trailer hitch becoming disengaged from the bumper of the Seymour car and the hitch or trailer tongue falling to the surface of the road. These findings, based on direct evidence, could reasonably have led the jury to the inference that the multi-clamp, bar-type trailer hitch was improperly installed on the Seymour car, that it became separated from the automobile while it was being operated in a normal fashion and that this separation caused the Seymour vehicle to veer to the left, cross the median and strike the Myers' automobile. Thus the jury verdict is not based on inferences drawn from other inferences. Rather, it may be viewed as being based on an inference which was drawn from a number of facts which were shown by direct evidence. We do not believe that the verdict in this case was based on sheer speculation, a condition which justifies a judgment notwithstanding the verdict under Kentucky law. Miller v. Watts, 436 S.W.2d 515 (Ky.1969).

■■ Despite the fact that the defendant produced a strong case in support of its theory that the trailer and hitch separated after the Seymour automobile went out of control and was not the cause of its sudden lunge to the left, the plaintiff's evidence created more than a mere possibility that the contrary was true. Furthermore, the jury might have accepted the defendant's theory that the left front tire blew out before the Seymour car began its erratic course and still held the defendant liable. If the trailer hitch came loose and eventually pulled free of the rear bumper following a blow out because it was not properly attached in the beginning, the jury could have found that an otherwise manageable event (a blow out) resulted in complete loss of control of the car. If a blow out merely activated a dangerous condition created by the negligence of the defendant, the blow out was not a superseding cause which would relieve the defendant of liability for its negligence. The jury could reasonably have found that the proximate cause of the collision, though not of the first lunge to the left, was the failure of the agents of the defendant to install the trailer hitch properly. Seelbach v. Cadick, 405 S.W. 2d 745, 750 (Ky.1966); United Fuel Gas Co. v. Thacker, 372 S.W.2d 784, 787 (Ky.1963).

Amerco argues that the verdict is excessive and that the amounts awarded to the estates of the three decedents were based on improper elements of damages. The plaintiff called an economist who projected the work life expectancy and probable future earnings of each of the decedents. In making his calculations, he assumed no increased earnings for Junior J. Myers and no adjustment was made for inflation. He used assumed annual earnings for Anna Lois Myers who was not working full time at her death and for Linda Ann Myers, the daughter of Junior J. and Anna Lois Myers, who had never worked. The assumed gross earnings over the period of work life expectancy for each of the decedents were discounted to their present

value and further reduced by an assumed cost of maintenance of each. In addition to earnings, the witness took into account Social Security benefits of all and retirement benefits which Junior J. Myers would have accrued with his employer. The jury accepted the testimony of this witness and awarded damages to each estate exactly equal to the discounted future earnings testified to, plus stipulated special damages.

 This witness was qualified as an economist and very carefully testified concerning the methods which he used in reaching his estimates of future earnings. He also specified a number of publications which he stated are generally relied upon by economists in making similar calculations and which he referred to in reaching independent conclusions with respect to each of the decedents. The measure of damages in wrongful death actions in Kentucky is the value of the destruction of the power of the decedent to earn money, not the destruction of income from a particular job or occupation. Roland v. Beckham, 408 S.W.2d 628 (Ky.1966). The award in such a case is not limited to the past earnings of the decedent, as these may not be indicative of his power to earn. Humble v. Mountain State Construction Co., 441 F.2d 816 (6th Cir. 1971). Under this rule, there is necessarily an element of speculation involved in determining the power to earn money, particularly in the case of children and others who have not established a history of earnings. Yet the Kentucky courts have consistently upheld verdicts in such cases in the face of argument that they are based on speculation. See, e. g. Rice v. Rizk, 453 S.W.2d 732 (Ky.1970). Under the Kentucky rule of damages a great deal of latitude must necessarily be allowed in wrongful death cases. City of Louisville v. Stuckenborg, 438 S.W.2d 94 (Ky.1968). The amount of damages to be awarded for a wrongful death is for the jury to determine, and a verdict will not be set aside as excessive unless at "first blush" it appears to result from passion and prejudice. Cassidy v. Quis-

enberry, 346 S.W.2d 304 (Ky.1961). We find that the evidence of Dr. Cann was competent and the verdicts are not excessive.

 The final issue concerns Amerco's claim that it is entitled to indemnity against James A. Seymour for the full amount of the verdicts because of the following provision which was contained in the lease contract between Amerco and Mr. Seymour.

> Customer agrees to indemnify and hold harmless Lessor and its duly authorized agents from any and all damages and/or liability arising out of or resulting from Customers' use of said trailer and/or equipment.

At the conclusion of all the proof, Amerco made a motion for a directed verdict on the question of indemnity in reliance on this contract provision. The court did not pass on the motion at that time, but after the jury verdict had exonerated Mr. and Mrs. Seymour and found Amerco guilty of negligence, the court entered a judgment dismissing all claims against the Seymours. Thereafter, Amerco filed a motion to amend the judgment so as to grant indemnity for the full amount awarded. Both parties have proceeded on the assumption that Kentucky law controls this issue. In General Accident Fire and Life Assurance Corporation, Ltd. v. Smith and Oby Company, 272 F.2d 581 (6th Cir. 1959), we held that an action to recover under an indemnity provision was governed by the law of Ohio where the contract was made in Ohio between Ohio companies. The contract in this case was made in Tennessee between a Tennessee resident and a Tennessee corporation. Under the law of Tennessee an indemnity agreement does not indemnify the indemnitee's own negligence unless it is clear and unambiguous from the language of the contract that this was the intention of the parties. Kroger Company v. Giem, 215 Tenn. 459, 387 S.W.2d 620 (1964); Brogdon v. Southern Railway Company, 384 F.2d 220 (6th Cir. 1967). The Kentucky Court of Appeals, in Fos-

son v. Ashland Oil and Refining Company, 309 S.W.2d 176 (Ky.1957), stated, "It is true that when there is doubt as to the meaning of an indemnity clause the construction should be against the contention that the contract was meant to indemnify against an indemnitee's own negligence. We have said that every presumption is against such an intention." 309 S.W.2d at 178. Thus, it appears that the rule is the same, whether the law of Tennessee or that of Kentucky is applied. The quoted language from the lease contract does not clearly show an intent that the customer will indemnify Amerco for damages or liability resulting from Amerco's own negligence. The district court correctly held that, in view of the jury finding, Amerco was not entitled to indemnity.

The judgment of the district court is affirmed.