**ARLIE LARIMER AND SONS, INC.,**
**Plaintiff-Appellant,**

v.

**KLEEN–LEEN, INC. and Ralston Purina Company, Defendants-Appellees.**

No. 75–1256.

United States Court of Appeals,
Sixth Circuit.

Argued June 19, 1975.

Decided Sept. 30, 1975.

John C. Lovett, Paul Shapiro, Lovett & Lewis, Benton, Ky., for plaintiff-appellant.

George R. Effinger, Paducah, Ky., Kenneth L. Anderson, Woodward, Hobson & Fulton, Louisville, Ky., for defendants-appellees.

Before EDWARDS, PECK and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

This is an appeal from a judgment in favor of the defendants in a diversity action seeking damages for an alleged breach of a contract for the lease of certain breeding swine. After three days of trial before a jury, the district court, on November 27, 1974, directed a verdict, holding that the evidence presented concerning the diseased condition of the leased animals at the time of delivery to plaintiff was insufficient to allow the case to go to the jury.

We are unable to agree, and reverse.

Plaintiff's amended complaint averred that it entered into a contract with defendant Kleen-Leen for the lease of two boars and 66 gilts for breeding stock and alleged that defendant Kleen-Leen breached the agreement expressly in its failure to provide "top quality"[1] swine for such purposes. It was further alleged that Kleen-Leen violated its implied warranty that the breeding stock leased would be fit and suitable for the purposes for which leased.

The written contract, in addition to providing for stipulated rentals, contained specific conditions which the producer was required to follow in the care and breeding of the leased swine. The leasing program offered by Kleen-Leen contemplated delivery of genetically superior breeding stock of Specific Pathogen Free (SPF) origin under a program which, carefully controlled as to breeding, feeding and living conditions would, it was hoped, permit a production of pork which would require half a pound less feed for each pound of pork produced. The heart of the program was the

---

1. The contract provided that the swine would be "top quality", but contained no definition of the term. The district judge thus heard testimony concerning the meaning of the term as understood by the parties in their contract negotiations and as described in the literature provided by Kleen-Leen in soliciting Larimer's business.

disease free quality of swine to be furnished.[2]

In extensive testimony taken at the trial, it appeared that of the boars leased, one failed to achieve the normal anticipated increase in weight after received by Larimer. Testimony indicated that it gained only 55 pounds in contrast to the 140 pounds gained by the other boar. This boar was later determined to have had arthritis.

The gilts were delivered to the Larimer farm in six lots commencing with an initial delivery on April 10, 1970, and terminating with a final delivery on September 4, 1970. The first group of gilts delivered on April 10 appeared to be healthy. Those delivered on May 8, according to Arlie Larimer, were not "as healthy as the first group in that their hair was long, their covering was long and, uh, there was some lameness and some stiffness that we noticed with number two group." Similarly the group of gilts delivered on July 31 was described by Larimer as follows:

"Well, they were, as with group two, oh, in maybe some degree worse . . . in that they were stiff and some of 'em lame and with a coating that showed that they hadn't been fed or that there was something wrong with their health or something."

Again as to the 13 gilts delivered August 7, 1970, Arlie Larimer testified that they appeared underweight. In the meanwhile he had noticed in the gilts delivered on July 31 "some sneezing and maybe there was some eyes watering in that group."

■ Extensive testimony was taken concerning the preparation of the Larimer farm for receipt of the Kleen-Leen stock from which the jury could find that the plaintiff had fully complied with all of the breeding and raising requirements of the stock and their progeny. Over 90 days had expired between the time the last hogs raised on the farm had been removed and the date of delivery of the first Kleen-Leen hogs. No other swine thereafter were ever raised on the premises during the contract period. A new farrowing house had been constructed for the Kleen-Leen stock and had never before been used. Its construction was designed along acceptable standards which kept the pigs off the ground. The only equipment which had been previously used for raising hogs, certain feeders, had been thoroughly sterilized. Contract requirements of immunization and vaccination for erysipelas and leptospirosis were complied with. Even foot baths for people entering the brooding areas were provided and used. In short, we find nothing in the record to indicate non-compliance by the plaintiff with the contractual conditions for raising the swine.

Notwithstanding the foregoing, the evidence showed that the leased swine and their progeny succumbed to a long list of ailments which culminated ultimately in the liquidation of the population of the entire herd remaining at the time.

Autopsies performed upon a number of the swine under the direction of Wade Kadel, a veterinarian and director of the Kentucky Diagnostic Laboratory, revealed the existence of a variety of diseases and conditions adversely affecting the health of the herd including scours (diarrhea probably caused by E Coli), anemia, chronic pneumonia, enteritis, vibrionic dysentery and mange, and finally and most important, extensive infestation with atrophic rhinitis.

Dr. Kadel described rhinitis as an inflammation of the nasal cavity of a hog

---

2. The Kleen-Leen program for delivering SPF stock is described in its sales brochure:

"In the primary SPF process, pigs are taken from the sow by hysterectomy and raised in Kleen-Leen's laboratory environment for several weeks. Thus, the sow-to-pig disease link is broken, making new hog health standards possible. Pigs leave the laboratory free of virus pneumonia, atrophic rhinitis and vibrionic dysentery since the sow-to-pig disease link is broken.

"Freedom from these specific disease organisms, as well as freedom of parasites, lice and mange, passes from generation to generation, so long as hogs are not exposed to these diseases and parasites."

which results in the decrease in the size of the cone shaped nasal ethmoid turbinate bones on either side of the hog's nose. These structures filter, cool or heat the air as it comes from the outside to the lungs. As a result of the rhinitis, air gets to the lungs without either filtration, heating or cooling. The disease, Dr. Kodel testified, was not a killer in its own right, but has a debilitating effect on the ability of the animal to purify the air it breathes and to make natural adjustments to its temperature. Clinical signs of atrophic rhinitis are sneezing, coughing, rougher hair coat and a poor rate of weight gain. According to the testimony, hogs so infected frequently develop secondary pneumonia, cough a lot, contract fever, and may eventually die of pneumonia. Those which do not die of the secondary effects fail to make the necessary weight gains to justify the expenditure for feed. Dr. Kadel testified extensively both on direct and cross examination to the source of atrophic rhinitis and to the means by which the disease can be transmitted. It is this latter testimony which formed the basis for the trial judge's direction of the verdict, since the defendants at all times admitted that ultimately the hogs were affected by atrophic rhinitis, but denied that they were so affected when delivered to the plaintiff.

■ In directing a verdict, the district judge recognized that under the law of Kentucky, he must

"consider all of the substantive and probitive evidence elicited during the trial, both on the direct and the cross examination of the witnesses and I must consider it in the light most favorable to Mr. Larimer.

"I do not weigh the credibility of the proof, but merely its legal sufficiency so as to arrive, in my own mind, as to whether or not the burden of going forward in this case has shifted to the Defendant."

■ Noting that there was no dispute that the swine herd eventually contracted atrophic rhinitis, the judge observed:

"[T]he question is how, when, and why they contracted the disease."

He concluded that viewing the evidence as a whole and particularly the testimony of Dr. Kadel, any answer which the jury might reach on the question of how, when and why the animals contracted the disease would have to be based on speculation and surmise. Under Kentucky law he felt compelled to direct a verdict for the defendant.

We note that the trial judge's entire attention in directing the verdict was devoted to the question of whether plaintiff had proved that the breeding stock was infected with atrophic rhinitis at the time it was delivered to the Larimer farm. While we reach a different conclusion as to the sufficiency of the evidence thereof, it must be observed that this was a law suit for breach of contract to deliver "top quality" breeding swine to plaintiff, and that the question of the presence of atrophic rhinitis was secondary to that issue. We conclude that in any event there was sufficient evidence to place before the jury the question of whether the swine delivered were "top quality" within the meaning of the contract. Testimony that the swine delivered were not top quality was given not only by Arlie Larimer and his sons, but also by two feed dealers who dealt in Ralston Purina products and who had occasion to observe them. In addition, photographs and weight records were introduced. There was evidence which, if believed, could lead the jury to conclude that certain swine which had purportedly been certified as processed through the Kleen-Leen organization may, in fact, have been waylaid en route and replaced by other non-conforming animals. Such evidence consisted of testimony that the animals were significantly lighter in weight than that reported on the shipping permit, that the animals received did not have ear tags, whereas those on the certificate were tagged, and that there was a significant difference in the reported mileage in two shipments of gilts from which a deviation en route might have been inferred.

The foregoing, we believe, would of itself have been sufficient to require submission of the breach of contract issue to the jury.

Beyond that, however, we are unable to agree with the trial judge's holding concerning the atrophic rhinitis. The trial judge stated essentially the correct legal standard for directing a verdict under Kentucky law. As recently noted by this court in *Amerco Marketing Co. of Memphis, Inc. v. Myers,* 494 F.2d 904 (6th Cir. 1974):

> When presented with a motion for a directed verdict, the trial court must view all the evidence most favorably to the party against whom the motion is made. *Rock v. Creacy,* 430 S.W.2d 137 (Ky.1968); *Price v. Firestone Tire & Rubber Company,* 321 F.2d 725 (6th Cir. 1963). 494 F.2d at 911

The district judge felt compelled to grant defendant's motion for directed verdict because he felt that a jury verdict for plaintiff would be based upon speculation or surmise. This conclusion was based upon his belief that as to the issue of causation of the atrophic rhinitis, plaintiff had not shown that it was "probable" as opposed to "merely possible" that the swine were infected at the time they were delivered to the plaintiff.

■■ As correctly noted by the district judge, under Kentucky law a jury verdict cannot be based upon speculation or surmise. *Midwestern V. W. Corp. v. Ringley,* 503 S.W.2d 745 (Ky.1973); *Huffman v. S. S. Mary and Elizabeth Hospital,* 475 S.W.2d 631 (Ky.1972).[3] Additionally, where plaintiff seeks to establish the element of causation by circumstantial evidence, the evidence must support a reasonable inference that de-

fendant's actions were the probable cause, as distinguished from a possible cause of plaintiff's damages. *Briner v. General Motors Corp.,* 461 S.W.2d 99 (Ky.1970). Further, as noted by the court in *Briner, supra :* .

> "It is, of course, often difficult to draw the line between a reasonable inference and speculation." 461 S.W.2d at 101

■ Applying this standard, we conclude that plaintiff presented sufficient evidence which, if believed by the jury, would permit the reasonable inference that atrophic rhinitis was present in the animals at the time of delivery. Dr. Kadel opined that based upon the evidence presented to him, the animals were infected at the time of delivery. He spoke in terms of probability and not possibility and backed his opinion up with adequate and credible medical authority. He noted that atrophic rhinitis is normally transmitted from hog to hog. He admitted that the rhinitis could have been contracted after delivery from nonswine sources such as people's feet, human sputum, wild animals and pets. He insisted, however, in the face of strenuous cross examination that "the most probable cause, far and away, uh, is hog to hog and, uh, I have read and read and read and I have yet to see a case, uh, where it was anything but hog to hog."

The testimony concerning the condition of the gilts at the time of delivery, particularly those received August 7, 1970, lends factual support for the veterinarian's opinion that the swine had rhinitis at the time they were delivered, particularly in view of the evidence indicating Larimer had faithfully complied with Kleen-Leen's program for raising

---

3. Appellees in their brief have relied particularly upon the decision of the Kentucky Court of Appeals in *Huffman v. S. S. Mary and Elizabeth Hospital, supra.* We have examined this decision carefully and find the case clearly distinguishable from the case at bar. In *Huffman,* a woman who contracted hepatitis sued a hospital alleging she got the disease from contaminated blood she received in a transfu-

sion while at the hospital. In upholding a directed verdict for defendants, the court noted that plaintiff's proofs established that the blood transfusion was only a *possible* as opposed to the *probable* cause of the hepatitis. For the reasons stated in our opinion, we conclude that plaintiff's proofs here indicate that the swine received were *probably* infected with rhinitis at the time delivered to Larimer.

the swine. This evidence was sufficient to allow Larimer to send his claim to the jury. We do not understand Kentucky law to impose a higher standard of proof of a fact than the nature of the case will in any event allow.

Reversed and remanded for a new trial. Costs to appellees.